1  Nathaniel Durrance (SBN: 229210)
   *nate@newmanlaw.com*
2  *Keith Scully, pro hac vice*
   *keith@newmanlaw.com*
3  Gregory M. Scialabba*, pro hac vice*
   *gs@newmanlaw.com*
4  Steven R. Gray*, pro hac vice*
   *steve@newmanlaw.com*
5  Newman LLP
6  100 Wilshire Blvd., Suite 700
   Santa Monica, CA 90401
7  Telephone: (310) 359-8200
   Facsimile: (310) 359-8190
8
9  Counsel for Defendant
10 Aspyr Media, Inc.

11            **UNITED STATES DISTRICT COURT**
12            **CENTRAL DISTRICT OF CALIFORNIA**

13 MALACHI MICKELONIS, JOSEPH          Case No. 8:23-cv-01220-MWC-ADS
   ALFILANI, JACOB ALVA-
14 MELVILLE, MICAIAH FLORES,           **DEFENDANT'S NOTICE OF**
15 MATTHEW GORKA, JARED                **MOTION AND MOTION FOR**
   HILLIARD, CHARLES KIRK, DAVID       **SUMMARY JUDGMENT**
16 KIRKLAND, YALE LIEBOWITZ,
   JACOB MUELLER, KEVIN MUNOZ,         District Judge Michelle Williams Court
17 COLEBIE NIEDERMEIER, JOSHUA
18 PALMER, BRYCE PHILLIPS,             Hearing Date: June 13, 2025
   CHRISTOPHER SOUSA, ROLANDO          Time: 1:30 p.m.
19 VAZQUEZ, ADRIAN VILLA, BRIAN        Department: 6A
   WALSH, and NICHOLAS YEE,
20 individually and on behalf of all others
21 similarly situated,

22            Plaintiffs,

23       v.

24 ASPYR MEDIA, INC. and DOES 1-5,

25            Defendants.

26
27
28

PLEASE TAKE NOTICE that on June 13, 2025, or as soon thereafter as counsel may be heard by the above-entitled court located at the First Street Courthouse, 350 W. 1st Street, Courtroom 6A, 6th Floor, Los Angeles, California 90012, Defendant Aspyr Media, Inc. will and hereby does move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on the following grounds: Plaintiffs do not have sufficient admissible evidence to demonstrate materiality, harm, knowledge, or anything to enjoin. Further, Plaintiffs fail to meet prerequisites or other state-specific elements for some of the classes they assert.

This motion is based upon this Notice of Motion and Motion for Summary Judgment and incorporated Memorandum of Points and Authorities; any facts, documents, or matters for which judicial notice is proper; any other or further papers filed or arguments made in support of the motion; as well as any oral argument presented at the time of the hearing.

Aspyr Media, Inc. certifies that prior to filing this motion, it conferred with counsel for Plaintiff under L.R. 7-3 in a good faith effort to eliminate the necessity for hearing the motion or to eliminate as many of the disputes as possible. The conference of counsel took place on March 31, 2025.

Dated: May 1, 2025                    Respectfully submitted,

Newman LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

s/ Keith Scully
Keith Scully, *pro hac vice*
*keith@newmanlaw.com*
Nathaniel Durrance (SBN: 229210)
*nate@newmanlaw.com*
*Gregory M. Scialabba, pro hac vice*
*gs@newmanlaw.com*
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone: (310) 359-8200
Facsimile: (310) 359-8190

Counsel for Defendant
Aspyr Media, Inc.

# Table of Contents

INTRODUCTION.................................................................................................1

UNDISPUTED FACTS.......................................................................................1

    A.   Aspyr is a game developer who releases both new games and historic games re-released for modern gaming platforms......................1

    B.   Aspyr re-released KOTOR II and intended to add a free bonus feature for die-hard fans of the original game........................................2

    C.   Aspyr received approval to release the Mod on Switch.........................3

    D.   Aspyr determined the Mod had no sale value and Plaintiffs have no evidence otherwise...................................................................................3

    E.   Aspyr broadly advertised KOTOR II, targeting different demographic groups that would be interested in different aspects of the game, with the Mod only noted as an afterthought for those few who remembered it and still cared...........................................................5

    F.   After giving approval for the Mod, Lucasfilm became concerned about the Mod Leaders ability to bind all Mod creators.........................7

    G.   Aspyr and the Mod Leaders addressed Lucasfilm's concerns through separate consents and alternative plans...................................7

    H.   Lucasfilm supported an alternative plan pending approval from counsel..................................................................................................8

    I.   After Lucasfilm retracted consent, Aspyr promptly announced that the Mod would not be released and offered a replacement game. ..........8

    J.   Aspyr's surveys and expert testimony demonstrate that the Mod has no economic value and most purchasers bought KOTOR II for other reasons.........................................................................................9

ARGUMENT .......................................................................................................9

    A.   Aspyr is entitled to summary judgment on all claims because the Mod is not material to a reasonable consumer. .....................................9

B.  Aspyr is entitled to summary judgment on all claims because
    Plaintiffs cannot prove the Mod has any economic value................... 13

    1.  Standing requires proof of economic loss. .......................... 13

    2.  Plaintiffs must prove economic loss as an element of their false
        advertising claims................................................ 15

C.  There is nothing to enjoin because Aspyr is no longer advertising
    the Mod. ............................................................. 17

D.  Claims requiring knowledge fail because Plaintiffs cannot prove that
    Aspyr knowingly misled consumers. ................................... 17

    1.  Aspyr reasonably believed the Mod could be released until
        Lucasfilm retracted consent in March 2022. ...................... 17

    2.  The California, Colorado, Oregon, and South Carolina classes
        must be dismissed because Plaintiffs cannot show Aspyr knew
        the statements were false when they were made. ................. 19

E.  Aspyr is entitled to summary judgment for any plaintiff or class
    member that did not see ads for the Mod prior to purchasing
    KOTOR II. ............................................................ 22

F.  The Georgia and Texas classes must be dismissed because Plaintiffs
    did not provide the required statutory notice. ...................... 23

G.  The Illinois class should be dismissed because there is no Illinois
    claim. .............................................................. 23

H.  Aspyr is entitled to summary judgment for all claims based on state
    law that requires reliance or causation. ............................ 23

I.  David Kirkland is not participating in the case and should be
    dismissed. .......................................................... 24

CONCLUSION................................................................ 25

CERTIFICATE OF COMPLIANCE................................................ 26

CERTIFICATE OF SERVICE................................................... 27

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*A.B. v. Google LLC*,
    737 F. Supp. 3d 869 (N.D. Cal. 2024) ............................................................. 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................ 9

*Archie v. Pop Warner Little Scholars, Inc.*,
    No. CV 16-6603 PSG (PLAx),
    2019 WL 4439493, 2019 U.S. Dist. LEXIS 160230 (C.D. Cal. Sep. 11, 2019) ..22

*Avery v. State Farm Mut. Auto. Ins. Co.*,
    216 Ill. 2d 100, 835 N.E.2d 801, 296 Ill. Dec. 448 (Ill. 2005) .......................... 16

*Backhaut v. Apple, Inc.*,
    74 F. Supp. 3d 1033 (N.D. Cal. 2014) ........................................................ 16, 22

*Balistreri v. McCormick & Co.*,
    No. 5:22-cv-00349-EJD,
    2023 U.S. Dist. LEXIS 162583 (N.D. Cal. Sep. 13, 2023) ............................... 19

*Bohr v. Tillamook County Creamery Association*,
    321 Or.App. 213, 516 P.3d 284 (Or. Ct. App. 2022) ........................................24

*Carlisle v. Nat'l Commer. Servs.*,
    No. 1:14-CV-515-TWT-LTW,
    2017 U.S. Dist. LEXIS 39954 (N.D. Ga. Feb. 22, 2017)................................... 17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................ 9

*Cent. Delta Water Agency v. United States*,
    306 F.3d 938 (9th Cir. 2002).......................................................................... 13

*Chowning v. Kohl's Dep't Stores, Inc.*,
    733 F. App'x 404 (9th Cir. 2018)..................................................................... 15

*Colgan v. Leatherman Tool Grp., Inc.*,
    135 Cal. App. 4th 663, 38 Cal. Rptr. 3d 36 (Cal. Ct. App. 2006) ..................... 19

*Crowe v. Tull*,
　　126 P.3d 196 (Colo. 2006)............................................................ 21, 22

*Davis v. Rebel Creamery LLC*,
　　No. 22-cv-04111-TSH,
　　2023 U.S. Dist. LEXIS 49642 (N.D. Cal. Mar. 23, 2023) .............................. 12

*Dickson v. Jack in the Box, Inc.*,
　　2024 Cal. Super. LEXIS 38573 ........................................................20

*Doe v. Varsity Brands, LLC*,
　　No. 6:22-3510-HMH,
　　2023 U.S. Dist. LEXIS 108008 (D.S.C. June 21, 2023) ................................. 10

*F.T.C. v. Tashman*,
　　318 F.3d 1273  (11th Cir. 2003)........................................................ 10

*Fletcher v. Celsius Holdings, Inc.*,
　　2011 Cal. Super. LEXIS 1552......................................................... 14

*Gonzales v. Bank of Am., N.A.*,
　　No. 2:14-cv-00088-GMN-VCF,
　　2015 U.S. Dist. LEXIS 106312 (D. Nev. Aug. 10, 2015) ................................ 10

*Health Promotion Specialists, LLC v. Bd. of Dentistry*,
　　403 S.C. 623, 743 S.E.2d 808 (S.C. 2013) ........................................... 16

*Hiner v. Bridgestone/Firestone, Inc.*,
　　91 Wn. App. 722, 959 P.2d 1158 (1998)............................................... 11

*Hughes v. Autozone Parts*,
　　2018 Cal. Super. LEXIS 112887....................................................... 19

*In re In re HomeAdvisor, Inc. Litig.*,
　　No. 16-cv-01849-PAB-KAS,
　　2024 U.S. Dist. LEXIS 165751 (D. Colo. Sep. 13, 2024) ................................ 16

*In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to
　　World Indices*,
　　715 F. Supp. 2d 1265 (S.D. Fla. 2010)................................................ 10

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

*In re NJOY Consumer Class Action Litig.*,
 No. CV 14-00428 MMM(JEMx),
 2014 U.S. Dist. LEXIS 196586 (C.D. Cal. May 27, 2014) ................................ 16

*In re Vioxx Class Cases*,
 180 Cal. App. 4th 116, 103 Cal. Rptr. 3d 83 (Cal. Ct. App. 2009)..................... 15

*Kowalsky v. Hewlett-Packard Co.*,
 771 F. Supp. 2d 1156 (N.D. Cal. 2011) ....................................................... 20, 21

*Kwikset Corp. v. Superior Court*,
 51 Cal. 4th 310, 120 Cal. Rptr. 3d 741, 246 P.3d 877 (2011) ............................ 13

*Leslie v. Fid. Nat'l Title Ins. Co.*,
 No. C08-5252BHS,
 2008 U.S. Dist. LEXIS 97338 (W.D. Wash. Nov. 21, 2008)............................ 11

*Mazza v. Am. Honda Motor Co.*,
 666 F.3d 581 (9th Cir. 2012) .......................................................................22

*McManus v. Sears, Roebuck & Co.*,
 No. 09-02-472 CV,
 2003 Tex. App. LEXIS 7462, 2003 WL 22024238 (Tex. App. Aug. 28, 2003) . 17

*McNeely v. Salado Crossing Holding, L.P.*,
 No. 04-16-00678-CV,
 2017 Tex. App. LEXIS 5398 (Tex. App. June 14, 2017) ................................. 10

*Moorer v. StemGenex Med. Grp., Inc.*,
 830 F. App'x 218 (9th Cir. 2020).................................................................22

*N.J. Citizen Action v. Schering-Plough Corp.*,
 367 N.J. Super. 8, 842 A.2d 174 (N.J. Super. Ct. App. Div. 2003)................... 16

*Neu v. Terminix Int'l, Inc.*,
 2008 U.S. Dist. LEXIS 60505, 2008 WL 2951390..........................................20

*Panag v. Farmers Ins. Co. of Wash.*,
 166 Wn.2d 27, 204 P.3d 885 (2009) ............................................................. 17

*POM Wonderful LLC v. Purely Juice, Inc.*,
 362 F. App'x 577 (9th Cir. 2009) ..................................................................20

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

*Providence Health & Servs.-Oregon v. Mancuso*,
  323 Or. App. 573, 524 P.3d 973 (2023) ................................................ 16

*Rathgeber v. James Hemenway, Inc.*
  335 Or. 404, 69 P.3d 710 (2003) ......................................................... 21

*Reed v. NBTY, Inc.*,
  No. EDCV 13-0142 JGB (OPx),
  2014 U.S. Dist. LEXIS 197398 (C.D. Cal. Nov. 18, 2014) ....................... 23

*Reid v. Johnson & Johnson*,
  780 F.3d 952 (9th Cir. 2015) ................................................................ 9

*Spokeo, Inc. v. Robins*,
  578 U.S. 330, 136 S. Ct. 1540, 1547 (2016) ........................................ 13

*State ex rel Rosenblum v. Living Essentials, LLC*,
  335 Or.App. 30; 558 P.3d 395 (Or. Ct. App. 2024) ............................... 10

*State ex rel. Medlock v. Nest Egg Soc. Today, Inc.*,
  290 S.C. 124, 348 S.E.2d 381 (S.C. Ct. App. 1986) ............................... 21

*State ex rel. Suthers v. Mandatory Poster Agency, Inc.*,
  260 P.3d 9 (Colo. App. 2009) .............................................................. 22

*Stephens v. Omni Ins. Co.*,
  138 Wn. App. 151, 159 P.3d 10 (2007) ................................................ 11

*Stewart v. Electrolux Home Prods.*,
  304 F. Supp. 3d 894 (E.D. Cal. 2018) ................................................... 20

*Sweidy v. Spring Ridge Acad.*,
  No. CV-21-08013-PHX-SPL,
  2023 U.S. Dist. LEXIS 143657 (D. Ariz. Aug. 15, 2023) ......................... 16

*Temple v. Fleetwood Enters.*,
  133 F. App'x 254 (6th Cir. 2005) .......................................................... 10

*Wheeler v. Estee Lauder Cos.*,
  No. SACV 12-882-JST (JPRx),
  2013 WL 12121543, 2013 U.S. Dist. LEXIS 202157 (C.D. Cal. Feb. 12, 2013)..22

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

*Whiteside v. Kimberly Clark Corp.*,
     108 F.4th 771 (9th Cir. 2024) ........................................................... 11

*Wilson v. Hewlett-Packard*,
     668 F.3d 1136 (9th Cir. 2012) ........................................................... 20

**Statutes**

815 Ill.Comp.Stat. § 505/2 .................................................................... 10

Cal. Bus. & Prof. Code § 17200 ............................................................ 21

Cal. Bus. & Prof. Code § 17500 ............................................................ 19

Colo. Rev. Stat. § 6-1-105 ...................................................................... 9

Ga. Code § 10-1-399 ............................................................................. 23

N.J. Stat. Ann. § 56:8-2 ......................................................................... 10

Or. Rev. Stat. Ann. 646.607 ................................................................... 21

Tex. Bus. & Com. Code § 17.505 .......................................................... 24

**Rules**

Fed. R. Civ. P. 56. .................................................................................... 9

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

Plaintiffs bring a class-action lawsuit for false advertising, unfair competition, and related state-law causes of action. All of Plaintiffs' claims stems from a statement at the end of a YouTube trailer for a video game on the Nintendo Switch saying "Restored Content DLC Coming Soon" and similar messaging in a handful of promotional tweets. The "restored content" in question was a user-created modification of the video game being released. At the time the statements were made, Defendant Aspyr believed them to be true. Aspyr had previously released the content (called a "mod") on a different gaming platform and intended to do the same for the Switch. It was only later, long after the statements were made that a third-party blocked Aspyr from releasing the mod.

It is unclear how many people ever saw the statements at issue. And Plaintiffs offer no consumer surveys or similar evidence to establish how a reasonable consumer would have understood the cryptic reference to additional content and how (if at all) it would have impacted the purchasing decision. Nor do Plaintiffs have evidence establishing the economic value of the mod—which was intended to be a free download.

Plaintiffs' attempt to substitute their own opinions and speculation as to the value of the content to the public at large. But such conjecture is insufficient to survive summary judgment and the Court should dismiss their claims.

# UNDISPUTED FACTS

**A.  Aspyr is a game developer who releases both new games and historic games re-released for modern gaming platforms.**

Aspyr is a video game developer with over 25 years of experience and over 200 titles released. (May 1, 2025 Declaration of Michael Rogers ("Rogers Decl.") at ¶ 2.) Aspyr develops and releases its own games and also recreates and re-releases historic games. *Id.* Aspyr has a longstanding arrangement with Lucasfilm games to release Star Wars historic titles. *Id.* Aspyr's model is to take a historic game and

1  release it on a modern platform like Steam or the Nintendo Switch. *Id.* Wherever

2  possible, Aspyr does its best to increase player enjoyment by adding features to the

3  games, both at the time of the release and after. *Id.*

4  **B.    Aspyr re-released KOTOR II and intended to add a free bonus feature for

5       die-hard fans of the original game.**

6         Star Wars: Knights of the Old Republic I ("KOTOR I") and its sequel

7  KOTOR II are the most popular Star Wars video games ever. (Rogers Decl. at ¶ 3.)

8  Each is a role-playing game where players adopt the persona of a Star Wars-

9  universe character and maneuver that character through a storyline. *Id.* Much like a

10  choose-your-own-adventure book, player choices dictate how the story evolves. *Id.*

11        Many games have the option for players to add their own content, including

12  maps, designs, challenges, and other features designed by the gameplaying

13  community. (May 1, 2025 Declaration of Frank Gilson "Gilson Decl." at ¶ 3.)

14  Others are "hacked" by gameplayers, resulting in new unofficial content becoming

15  available. *Id.* These community add-ons (referred to as "mods," or "downloadable

16  content," or its abbreviation, "DLC") are not designed by the game studio and may

17  contain flaws, disrupt gameplay, or have other issues. *Id.* There are tens of

18  thousands of community mods across all games; they range from complex, carefully

19  crafted masterpieces to janky bits of code that barely function. *Id.* Regardless of

20  quality, community mods generally aren't sold for profit. *Id.* They're a fun hobby

21  for game enthusiasts who want to share their creativity with the world. *Id.*

22        Several years after KOTOR II's release on Xbox in 2004, a group of fans

23  created the mod at issue in this lawsuit (the "Mod") by discovering previously

24  unreleased code in the game itself. (Rogers Decl. at ¶ 4.) The Mod includes a few

25  new characters and an alternate ending. *Id.* The group of fans who worked together

26  to create the Mod included programmers as well as others who supplied new voice-

27  overs and other contributions. *Id.* They worked under the leadership of two

28  people—the Mod Leaders—who spoke for the group and had authority to control

1  where the Mod was released. *Id.*

2      In approximately 2016, Aspyr obtained permission from Lucasfilm to re-
3  release KOTOR II. (Rogers Decl. at ¶ 5.) Video games can be played on a variety of
4  platforms, including the Steam platform, which allows Windows users to play
5  games on their personal computers (PCs), Nintendo Switch, Microsoft XBox, and
6  others. *Id.*

7      KOTOR II was re-released for Steam in 2017. (Rogers Decl. at ¶ 6.) Steam
8  users can download mods from both game studios (like Aspyr) and other users (like
9  the Mod creators). *Id.* So, as an added bonus for players who enjoyed the Mod,
10  Aspyr negotiated with the Mod Leaders to release the Mod at the same time. The
11  Mod was free on Steam, just as it had been when it was originally released in the
12  2000s. *Id.*

13  **C.   Aspyr received approval to release the Mod on Switch.**

14      Aspyr next planned to release KOTOR II on Nintendo′s Switch gaming
15  platform. (Rogers Decl. at ¶ 7.) Aspyr contacted the Mod Leaders, who signed a
16  formal release on the group's behalf on May 10, 2022. (Rogers Decl. at ¶ 8; Dkt. 91-
17  2, 93-12.) Aspyr also approached Nintendo, who agreed to release the Mod through
18  its platform. (Rogers Decl. at ¶ 9, Att. A.) By May 21, 2022, all parties including
19  Lucasfilm had approved release. (Rogers Decl. at ¶ 10; Dkt. 91-3, 93-13.) The
20  approvals were based on the same arrangement that Aspyr had used for the Mod
21  when it released it on Steam in 2017—the approved version included a "Special
22  Thanks" section crediting the Mod contributors by name in some cases and by only
23  gamer aliases in others. (Rogers Decl. at ¶ 11.)

24  **D.   Aspyr determined the Mod had no sale value and Plaintiffs have no**
25      **evidence otherwise.**

26      While Aspyr's video games have sold for a wide range of prices, its Star Wars
27  games have generally sold for between $9 and $15, with no regard to whether a mod
28  or other non-original content was released with them. (Rogers Decl. at ¶ 12.) Aspyr

always planned to offer the Mod for free on all platforms. *Id.* In fact, Lucasfilm required that it be free as a condition to approve release. *Id.* Moreover, Aspyr knew that offering the Mod for free was expected by the Mod contributors and that this was consistent with the modding community's belief, that "you don't charge for mods." (May 1, 2025 Declaration of Michael Blair ("Blair Decl.") at ¶ 2.)

Accordingly, KOTOR II was priced in line with Aspyr's normal prices for Star Wars games—$11.99 for the basic game, or similar prices if sold in a bundle with other games. (Rogers Decl. at ¶ 13.) The intent was that users could decide whether to later download the Mod when it was ultimately released at no charge. *Id.*

Frank Gilson is one of Aspyr's experts with a career's worth of experience marketing and pricing videogames, including mods. (Gilson Decl. at ¶¶ 2, 4.) He evaluated Aspyr's pricing for KOTOR II and Aspyr's decision to release the Mod for free. (*Id.* at ¶ 5 and Att. A.) He concluded that, because the Mod was designed by community members and has all the characteristics of a community mod, the Mod's economic value is zero. *Id.* He further concluded that KOTOR II was priced low and that the price was not inflated to account for the Mod's anticipated subsequent release. *Id.*

On March 24, 2025, Plaintiffs disclosed an expert report from Dr. Wade Roberts and declaration from Dr. Andrea Matthews. (May 1, 2025 Declaration of Keith Scully ("Scully Decl." at ¶2, Atts. A, B.) Dr. Roberts provided an outline of how he would approach determining the value (if any) of the Mod. *Id.* He proposed selecting a representative sample of KOTOR II purchasers and interviewing them about their purchasing decisions. He then proposed a second round of interviews to ascertain what dollar value the purchasers assigned to KOTOR II with and without the Mod. Dr. Roberts produced no further reports, and at the close of expert discovery he admitted that none of those interviews had been done. (Scully Decl., Att. A at 11:11–15; 15:2–5, 15–17.) He further admitted that his research might reveal that some members of the class never saw advertisement for the Mod, (*id.* at

20:8–10), and that the degree to which class members were influenced by advertisements, or even knew what the Mod was, is speculative at this juncture. (*Id.* at 20:11–18; 20:3–6).

For her part, Dr. Matthews has a PhD in marketing and has testified in twenty cases. (Scully Decl., Att. N at 5:8–12.) In each prior case, she relied on survey evidence to form conclusions. (*Id.* at 5:13–15.) But in this matter, she did not review survey evidence but instead relied on consumer comments from a Twitter feed and YouTube posts about the game. She testified that she reviewed just those comments in the Second Amended Complaint itself (54 comments). (*Id.* at 21:11–15) (Dkt. 44, pp. 6–10, 12–16). Over 160,000 copies of the game were sold worldwide, meaning that the comments constitute .034% of purchasers. (Scully Decl. at ¶ 4). The comments express disappointment with Aspyr's inability to release the Mod but do not assign any dollar value to it.

Dr. Matthews was also presented with a single deposition transcript, that of Chris Bashaar, Aspyr's brand manager, along with a few internal marketing documents hand-selected by Plaintiffs. (Dkt. 79 at pp. 4–5, ¶¶12–18; Scully Decl., Att. N at 42:7–12.) Dr. Matthews reviewed these materials and concluded that "the marketing team of Aspyr believed that the [Mod] was a material reason for consumers to purchase KOTOR II, and treated it as such in their marketing strategy and tactics." (Dkt. 79 at p. 11, ¶ 46.) From this, she draws the conclusion that either the marketing team must be right or incompetent, and because they seem competent, the Court should find the Mod was a material factor in each and every consumer purchase. (Dkt. 79 at p. 6, ¶ 30.) She expresses no opinion on the monetary value of the Mod.

**E.    Aspyr broadly advertised KOTOR II, targeting different demographic groups that would be interested in different aspects of the game, with the Mod only noted as an afterthought for those few who remembered it and still cared.**

Video-game purchasers vary tremendously in terms of interests and

demographics. (Rogers Decl. at ¶ 14.) Aspyr studies its target market carefully and uses both in-house staff and marketing consultants to track who buys its games and what features appeal to each demographic. *Id*. Marketing strategy for any game, including KOTOR II, is multi-pronged and aims to advertise different features of the game to appeal to different consumers. *Id*.

A significant segment of KOTOR II's market is comprised of people interested in Star Wars rather than video games in particular. (Rogers Decl. at ¶ 15.) Marketing for those consumers focused on emphasizing the Star Wars theme and the Lucasfilm logo. *Id*. Another large segment is players interested in KOTOR II's game type—a first-person, choose-your-own-adventure story. *Id*. The bulk of advertising was focused on this demographic, with a nearly minute-long YouTube trailer (like a movie preview) showing actual gameplay and describing the story. *Id*. Other advertising described the storyline and style of play for those unfamiliar with KOTOR and KOTOR II. *Id*.

On May 29, 2022, Aspyr posted the 57-second YouTube trailer for KOTOR II. A "Coming Soon: Restored Content DLC" announcement appeared in the video's final four seconds. (Dkt. 93-10 at ¶ 9; Dkt. 91-4, 93-14.) YouTube trailers can vary in length, but users can skip every trailer after the first five seconds of play. (Rogers Decl. at ¶ 16.) Many YouTube viewers skip after the first five seconds. *Id*. The trailer was also available as a link on Aspyr's and Nintendo's webpages. *Id*.

Aspyr announced the Mod in a tweet on May 27, 2022, and a few more times in June. (Rogers Decl. at ¶ 17.) Aspyr uses its X (Twitter) feed to communicate with consumers who are generally already Aspyr customers and are so interested in video games that they want regular updates on upcoming releases and other developments. *Id*. Many Twitter users have broad-ranging feeds and receive hundreds of Tweets per day. *Id*. Particular Tweets may or may not be read and there is no evidence regarding how many people saw the Tweets referencing the Mod or that anyone actually relied on them to make a purchasing decision. *Id*.

Twitter also enables followers to post comments in response to Tweets. (Rogers Decl. at ¶ 18.) Comments then become part of the feed on a particular Tweet, meaning that if a follower chooses they can scroll through not only the original Tweet but also all the comments. *Id.* Plaintiffs identify a few occasions where Aspyr responded to questions about when the Mod would be released. To view those exchanges, a consumer would have had to first view the particular feed and also then scroll through a series of comments from other persons. *Id.*

On June 8, 2022, Aspyr released a fully-functional version of KOTOR II for Nintendo Switch with the Mod release still pending. (Rogers Decl. at ¶ 19.) Nintendo's website had no statements about the Mod or its release but did feature screenshots of gameplay, the Lucasfilm logo, and the words "Star Wars" prominently displayed. *Id.* The only way a consumer would know about the Mod from the website is if they clicked the link to the trailer and watched all 57 seconds of it to the very end. *Id.*

**F.    After giving approval for the Mod, Lucasfilm became concerned about the Mod Leaders ability to bind all Mod creators.**

On June 28, 2022, Lucasfilm asked that the Mod credits be changed to reflect only real names, not gamer aliases. (Rogers Decl. at ¶ 20.) Some Mod contributors, however, were uncomfortable with disclosing their real identities. *Id.* Aspyr also learned that a few contributors to the Mod couldn't be reached at the time the release was signed. *Id.* Lucasfilm then expressed concern that the Mod Leaders might not be able to legally bind all of the contributors and asked Aspyr to secure individual consents. (Dkt. 91-1, 93-1 at ASPYR000588.)

**G.    Aspyr and the Mod Leaders addressed Lucasfilm's concerns through separate consents and alternative plans.**

Aspyr and the Mod Leaders set out to fulfill Lucasfilm's request. (Rogers Decl. at ¶ 21, Att. B.) In addition to trying to obtain separate permission from each individual Mod contributor, one of the Mod Leaders noted that the contributions of

several persons listed in the credits were minimal and could probably be cut out or replaced without significantly impacting the Mod. (Rogers Decl. at ¶ 22, Att. C) After most of the Mod contributors agreed to sign the written agreements but several couldn't be found, one of the Mod Leaders suggested "that we only need signatures from people who created something custom instead of just scripting pre-existing content," and noted that they already had all those contributors' signatures. (Rogers Decl. at ¶ 23, Att. D.)

**H.    Lucasfilm supported an alternative plan pending approval from counsel.**

To respond to these new developments, Aspyr met with Lucasfilm in mid-September 2022. (Dkt. 91-1, 93-1 at ASPYR000588.) Aspyr proposed either releasing the Mod with the approvals it had, removing persons who made minimal contributions, or in the alternative releasing the DLC through a third-party platform rather than as an official Nintendo release. (Dkt. 91-5; 93-16 at ASPYR000592, 628, and 630.) Feedback from Lucasfilm during the meeting was encouraging, in particular with regard to the alternative platform option. (Dkt. 91-5; 93-16 at ASPYR000634.) And following the meeting, Lucasfilm continued to provide positive assurances throughout October 2022, while waiting for final approval from counsel. (Dkt. 91-6; 93-17.)  Aspyr continued to push Lucasfilm for final approval over the next few months. (Dkt. 91-6; 93-17 at ASPYR000595.)

**I.    After Lucasfilm retracted consent, Aspyr promptly announced that the Mod would not be released and offered a replacement game.**

In March 2023, Lucasfilm unexpectedly announced that it would not approve the Mod's release. (Rogers Decl. at at ¶ 24.) On June 2, 2023, Aspyr announced that it would be unable to release the Mod and offered a free game to maintain customer loyalty. (Rogers Decl. at ¶ 26.)

**J.    Aspyr's surveys and expert testimony demonstrate that the Mod has no economic value and most purchasers bought KOTOR II for other reasons.**

Expert surveys confirmed that the vast majority of purchasers of KOTOR II did so for the game itself and not for the Mod. *See* Dkt. 93-24, p. 13. When asked for all the reasons that come to mind for why respondents were satisfied or dissatisfied with their purchase of the game, only 0.7% of respondents (2 out of 300) mentioned anything having to do with the Mod. In fact, almost all purchasers (more than 96%) were satisfied with their purchase of KOTOR II without the Mod. *Id.*

## ARGUMENT

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets that requirement, the burden shifts to the other party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "[T]he nonmovant cannot manufacture a disputed material fact where none exists[.]" *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984).

**A.    Aspyr is entitled to summary judgment on all claims because the Mod is not material to a reasonable consumer.**

Although specifics vary by State, Plaintiffs must prove that statements about the Mod were material to a reasonable consumer for every claim.[1]

---

[1] **California:** *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) (California) ("violations of the UCL, FAL, and CLRA are evaluated from the vantage point of a 'reasonable consumer.'"). **Colorado:** Colo. Rev. Stat. § 6-1-105(1)(u) (prohibiting "disclos[ing] material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the

consumer to enter into a transaction"). **Florida:** *Adelson v. U.S. Legal Support, Inc. (In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to World Indices)*, 715 F. Supp. 2d 1265, 1281 (S.D. Fla. 2010) (explaining that Florida courts follow the federal standard defining deceptive trade practices, and that a deceptive practice under federal law is a "material representation or omission that is likely to mislead the consumers acting reasonably under the circumstances") (internal citations omitted); *Griffin v. Publix Super Mkts., Inc.*, No. 8:23-cv-1490-SDM-AAS, 2024 U.S. Dist. LEXIS 91479, at *2 (M.D. Fla. May 22, 2024) ("[T]to assert a claim under GFBPA, Griffin must establish that the label includes a 'material representation' that is 'likely to mislead customers acting reasonably under the circumstances.'") (citing *F.T.C. v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *Georgia ex rel. Carr v. Elite Integrated Med., LLC*, 533 F. Supp. 3d 1303, 1312 n.4 (N.D. Ga. 2021) (noting that the GFBPA is interpreted and construed consistently with the Federal Trade Commission Act"). **Illinois:** 815 Ill.Comp.Stat. § 505/2 (prohibiting the "misrepresentation or the concealment, suppression, or omission of any material fact" in the conduct of trade or commerce). **Nevada:** *Gonzales v. Bank of Am., N.A.*, 2015 WL 4744432, 2015 U.S. Dist. LEXIS 106312, at *7 (D. Nev. Aug. 10, 2015) ("The NDTPA prohibits a seller from making false statements or misrepresentations about his or her goods or services, or failing to disclose material facts about his or her goods or services."). **New Jersey:** N.J. Stat. Ann. § 56:8-2 (CFA, prohibiting "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact. . . in connection with the sale or advertisement of any merchandise…"); *Temple v. Fleetwood Enters*., 133 F. App'x 254, 265-66 (6th Cir. 2005) ("To make out a prima facie claim under the CSPA, a plaintiff must show a material misrepresentation, deceptive act or omission that impacted his decision to purchase the item at issue.") (citation and quotations omitted). **Oregon:** *State ex rel Rosenblum v. Living Essentials, LLC*, 558 P.3d 395, 399 (Or. Ct. App. 2024) (Oregon UTPA requires proof that "defendants' statements at issue were 'material to consumer purchasing decisions'".). **S. Carolina:** *Doe v. Varsity Brands, LLC*, 2023 WL 4113185, 2023 U.S. Dist. LEXIS 108008, at *29 (D.S.C. June 21, 2023) ("Although SCUTPA does not define what qualifies as a 'deceptive' act, it provides that courts 'will be guided by' [FTC] and federal court interpretations of § 5(a)(1) of the Federal Trade Commission Act," which indicates that "[a] practice is deceptive for § 5(a)(1) purposes if it is material and 'likely to mislead' a reasonable consumer.") (citation omitted). **Texas:** *McNeely v. Salado Crossing Holding, L.P.*, 2017 WL 2561551, 2017 Tex. App. LEXIS 5398, at *9 (Tex. App. June 14, 2017) ("For a misrepresentation

The reasonable consumer standard requires more than a mere possibility that the claim "might conceivably be misunderstood by some few consumers" and instead "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 777–78 (9th Cir. 2024). Stated another way, a complaint asserting a violation of these laws "must allege that the packaging will deceive many consumers, not just that a few might be deceived." *Id.* at 778. And as the *Whiteside* court noted, "consumers of everyday items are not expected to study labels with the same diligence as consumers of specialty products." *Id.* at 782. Plaintiffs cannot meet their burden because reasonable consumers would not know what a DLC was or have any knowledge of the Mod. Instead, the statements would only make sense to persons with specialized knowledge, like Plaintiffs.

KOTOR II and KOTOR I are the most popular Star Wars games ever. That popularity existed long before the original Mod and long before the Mod became available on Steam. It is unsurprising, therefore, that survey evidence confirms that almost all purchased KOTOR II for the storied game itself—or for its connection to Star Wars—and not for the Mod. *See* Dkt. 93-24, Expert Report of Hal Poret, p. 13. Specifically, when asked for all the reasons that come to mind why respondents were satisfied or dissatisfied with their purchase of the game, only 0.7% of respondents (2 out of 300) mentioned anything having to do with the Mod. In fact, almost all purchasers (more than 96%) were satisfied with their purchase of

---

to be false, misleading, or deceptive under the DTPA, the misrepresentation must be of a material fact…") (citation and quotations omitted). **Washington:** *Leslie v. Fid. Nat'l Title Ins. Co.*, 2008 WL 5000275, 2008 U.S. Dist. LEXIS 97338, at *14 (W.D. Wash. Nov. 21, 2008) (under the CPA, implicit in the term "deceptive" is "understanding that the actor misrepresented something of material importance.") (citing *Stephens v. Omni Ins. Co.*, 159 P.3d 10, 18 (2007) (quoting *Hiner v. Bridgestone/Firestone, Inc.*, 959 P.2d 1158, 1163 (1998)) (emphasis in original omitted).

1  KOTOR II without the Mod. *Id.*

2      Aspyr targets its marketing at various segments of the buying public. One

3  small subset is persons like Plaintiffs who all a) played the original Kotor II game b)

4  downloaded and enjoyed the original mod, c) remember the original mod, d) want

5  to continue playing the game twenty years later, e) saw the advertising, and f) knew

6  what the term "DLC" referred to in a four-second clip on a 57-second

7  advertisement, or signed up to receive Tweets about Kotor II, and g) assigned some

8  value to the Mod. Plaintiffs have no survey evidence or any evidence whatsoever

9  that a reasonable consumer would meet any let alone all of these criteria. Instead,

10  they point only to their own opinion, the 54 complaints on social media (against

11  sales of 160,000 copies) and the fact that the YouTube trailer was widely viewed.

12  But this ignores that the trailer's only reference to the Mod was a cryptic "Restored

13  Content DLC Coming Soon" announcement at the end of the video—and Plaintiffs

14  cannot even establish how many people watched to the end of the trailer to see that.

15  Plaintiffs' speculation about how many people might have seen, understood, and

16  relied on, the announcement is no substitute for survey evidence measuring the

17  statement's reach and materiality. And, at summary judgment, Plaintiffs must do

18  more than speculate that every person who bought the game is like them.

19      Plaintiffs may argue that the targeted consumers are a narrower group than

20  general consumers, and thus a different standard of knowledge about what the Mod

21  is should be assumed. But Plaintiffs' class is *all* persons who bought KOTOR II, not

22  the subset with experience with and knowledge of the Mod. And even if Plaintiffs

23  had narrowed their class—and assuming that there was some conceivable way to

24  identify those particular persons—it wouldn't matter. The fact that a small segment

25  of an audience may have specialized knowledge is irrelevant when advertising is

26  directed to the general public. *See, e.g.*, *Davis v. Rebel Creamery LLC*, 2023 WL

27  2620900, 2023 U.S. Dist. LEXIS 49642, at *18 (N.D. Cal. Mar. 23, 2023) (where

28  product advertising is not directly focused on Keto diet consumers, advertising

must be considered in light of all consumers of the product, not just those on a Keto diet). The advertisement was the last four seconds of a widely distributed 57-second video designed to appeal to all audiences. The Tweets were sent out to all persons who signed up to receive Aspyr's Twitter feed. Because the advertising was aimed at all consumers, not just those who knew about the Mod, the audience in question must include those without specialized knowledge.

**B.  Aspyr is entitled to summary judgment on all claims because Plaintiffs cannot prove the Mod has any economic value.**

### 1.  Standing requires proof of economic loss.

Standing consists of three elements—a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, a plaintiff must show that he or she "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 339. Because elements for standing are an indispensable part of Plaintiffs' case, they are not mere pleading requirements but instead must be supported by admissible evidence at each stage of the case. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

Injury in fact in the context of a UCL claim means that Plaintiffs must:

(1) prove a loss or deprivation of money or property sufficient to qualify as economic injury, and (2) show that the economic injury was the result of the unfair business practice or false advertising that is the gravamen of the claim.

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 321–22 (2011). Plaintiffs cannot do so because the Mod was a free add-on. Aspyr valued it at nothing and did not charge for it. In fact, Lucasfilm approved the Mod's release only on that condition. That is further reflected in the price of KOTOR II being in line with Aspyr's other games without mods. Aspyr's expert testimony establishes that in the

gaming industry, a mod of this nature isn't an item of value that's sold. It's something that is made available for free because it's fun and recognizes the contribution of gaming community members. Aspyr's uncontroverted survey evidence further bolsters that the DLC had no value to consumers.

Plaintiffs offer nothing more than conjecture and opinion in response. Plaintiffs present their own testimony that the Mod had personal value to them. But mere disappointment does not suffice. *Fletcher v. Celsius Holdings, Inc.*, 2011 Cal. Super. LEXIS 1552, *14 (Cal. Super. Ct. L.A. Cnty. Sept. 1, 2011) (rejecting the notion that "[a]ny disappointed consumer can allege that a product, for whatever reason, failed to perform" as conferring standing).

Plaintiffs next offer the testimony of Dr. Wade Roberts. Dr. Roberts' testimony bolsters Aspyr's position that Plaintiffs are unable to proceed with the evidence they have. Dr. Roberts' report established that to prove the Mod had any value, consumers would have to assign different dollar figures to what they would pay for KOTOR II without the Mod and with it. He proposed identifying consumers who had purchased KOTOR II and setting up a series of interviews and surveys using one of two survey methods to discover how consumers valued the Mod. But discovery has closed and Dr. Roberts does no more than speculate these surveys might prove that the Mod had value. As he concedes, the surveys are not done and they also might show it has no value.

Plaintiffs finally rely on the testimony of Dr. Andrea Matthews, who evaluated a series of complaints Plaintiffs found online and parroted in the complaint. But those complaints do nothing more than express anger and disappointment; they do not establish that the Mod was anything other than a free gift that was not ultimately provided. Dr. Matthews did no consumer surveys, interviewed no consumers, and applied no method to her review.

Dr. Matthews also opines on a series of quotes from Aspyr's marketing team, claiming that those quotes establish materiality because either Aspyr's marketing

team was right that consumers would value the Mod or that the team was
incompetent. But this approach was explicitly rejected in *Shanks v. Jarrow
Formulas, Inc.*, which dismissed similar evidence because a company's internal
perspective on features "does not provide any insight into a reasonable consumer's
purchasing decisions." 2019 WL 4398506, 2019 U.S. Dist. LEXIS 160199, at *15 –
16 (C.D. Cal. Aug. 27, 2019).

> **2.    Plaintiffs must prove economic loss as an element of their false
> advertising claims.**

Even if Plaintiffs had standing, each of Plaintiffs' claims, except for their claim
for injunctive relief, requires proof of economic loss as an element. For example,
under California's Unfair Competition Law, Plaintiffs bear the burden at the
summary judgment stage of showing entitlement to restitution. *Chowning v. Kohl's
Dep't Stores, Inc.*, 733 F. App'x 404, 406 (9th Cir. 2018). Where a plaintiff receives
at least some value from the product, the proper measure of restitution is "[t]he
difference between what the plaintiff paid and the value of what the plaintiff
received." *Id.* at 405 (9th Cir. 2018) (citing *In re Vioxx Class Cases*, 180 Cal. App.
4th 116, 131 (Cal. Ct. App. 2009)). At summary judgment, Plaintiffs must present
competent evidence establishing that value. For example, the *Chowning* plaintiff
admitted that the item she purchased—an article of clothing—had some value.
*Chowning,* supra. The court found for the defendant at summary judgment because
the Plaintiff's own testimony and that of her expert could not establish an actual
monetary loss. *Id.* at 406.

Likewise, in *Shanks v. Jarrow Formulas, Inc.*, 2019 WL 7905745, 2019 U.S.
Dist. LEXIS 227427 (C.D. Cal. Dec. 27, 2019), a plaintiff believed he was buying "a
non-hydrogenated coconut oil that was free of trans fatty acids," based on
advertising that the product had "No Trans Fatty Acids." *Id.* at *2–3. The court
observed that "Plaintiff has introduced no evidence as to the value Plaintiff
received, versus what Plaintiff actually paid for the coconut oil" and granted

summary judgment accordingly. *Id.* at *10–11. *See also In re NJOY Consumer Class Action Litig.*, 2015 WL 12732461, 2014 U.S. Dist. LEXIS 196586, at *57–58 (C.D. Cal. May 27, 2014) (noting that both UCL and CLRA claims require suffering "economic injury" as a result of reliance on the alleged misrepresentation); *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1048 (N.D. Cal. 2014) (same).

All of Plaintiffs' other claims likewise require proof of actual harm in order to proceed.[2] Plaintiffs' unvarnished personal opinion no more meets the element of

---

[2] **Arizona***: Sweidy v. Spring Ridge Acad.*, 2023 WL 5278680, 2023 U.S. Dist. LEXIS 143657, at *11–12 (D. Ariz. Aug. 15, 2023) ("Plaintiff's alternative theory of fraud does not fit within Arizona's framework for the common law tort of fraud because it does not directly involve a pecuniary or economic loss… Plaintiff's ACFA claim against Defendant Borges fails for the same reason."). **Colorado:** *In re In re HomeAdvisor, Inc. Litig.*, 2024 WL 4187099, 2024 U.S. Dist. LEXIS 165751, at *72–74 (D. Colo. Sept. 13, 2024) ("courts have previously found that the following types of injuries are covered under the CCPA: injury to property; economic loss; harm to reputation; and loss of business"). **Florida:** *A.B. v. Google LLC*, 737 F. Supp. 3d 869, 883 (N.D. Cal. 2024) ("[The] FDUTPA require[s] a deceptive act that misleads consumers and causes them to suffer an injury."). **Illinois:** *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 858–60 (Ill. 2005) (ICFA requires "actual damage"). **Nevada:** *R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct.*, 514 P.3d 425, 429 (Nev. 2022) (plaintiff must show "direct harm" under NDTPA). **New Jersey:** *N.J. Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 176 (N.J. Super. Ct. App. Div. 2003) (NJCFA requires "ascertainable loss of moneys or property"). **Ohio:** *Kelley v. Insys Therapeutics, Inc.*, 2019 WL 329600, 2019 U.S. Dist. LEXIS 12507, at *17 (N.D. Ohio Jan. 25, 2019 (OCSPA claims "involve economic harm to consumers"). **Oregon:** *Providence Health & Servs.-Oregon v. Mancuso*, 524 P.3d 973, 983 (2023) ("the loss required for a UTPA claim must be specifically of money or property, real or personal…. [N]oneconomic losses cognizable in a civil action— such as physical pain, emotional distress, or humiliation—will not satisfy a private UTPA plaintiff's burden."). **South Carolina:** *Health Promotion Specialists, LLC v. Bd. of Dentistry*, 743 S.E.2d 808, 815–16 (S.C. 2013) (private action under SCUTPA requires "ascertainable loss of money or property"). **Texas:** *McManus v. Sears, Roebuck & Co.*, 2003 WL 22024238, 2003 Tex. App. LEXIS 7462, at *10 (Tex. App.

harm than it provides standing.

**C.    There is nothing to enjoin because Aspyr is no longer advertising the Mod.**

A court may only enjoin allegedly false advertising that has ceased if it is likely to recur. *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000). And a court may only enjoin conduct by a party, not non-parties who are outside of the defendant's control. *Certified Nutraceuticals, Inc. v. Clorox Co.*, 2022 WL 2803118, 2022 U.S. Dist. LEXIS 127238, at *13 (S.D. Cal. July 18, 2022).

Plaintiffs request injunctive relief to take down the portion of the trailer that states the Mod is coming soon. But Aspyr has already taken down all versions of the trailer within its control. Plaintiffs' claim that there are other versions, such as on IGN's (Internet Gaming News) website, are all for locations that Aspyr does not control and that the Court cannot compel unless they are made parties.

**D.    Claims requiring knowledge fail because Plaintiffs cannot prove that Aspyr knowingly misled consumers.**

**1.    Aspyr reasonably believed the Mod could be released until Lucasfilm retracted consent in March 2022.**

Aspyr reasonably believed the Mod would be released when it posted the KOTOR II trailer on YouTube on May 29, 2022. (Rogers Decl. at ¶25, Att. F.) At that point, the group of Mod contributors had given their approval through their

---

Aug. 28, 2003) (TDTPA requires "actual damages"). **Washington:** *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 899 (Wash. 2009) ("Personal injuries, as opposed to injuries to 'business or property,' are not compensable and do not satisfy the injury requirement ... Thus, damages for mental distress, embarrassment, and inconvenience are not recoverable under the CPA."). **Georgia** may be the sole exception: *Carlisle v. Nat'l Commer. Servs.*, No. 1:14-CV-515-TWT-LTW, 2017 U.S. Dist. LEXIS 39954, at *34-35 (N.D. Ga. Feb. 22, 2017) ("Unlike other torts, however, an award for general damages under the FBPA is limited to those damages that can be measured by 'actual injury suffered.'... Wounding a man's feelings is an actual injury and results in actual damages.")

1   spokesperson who signed a release. (Dkt. 91-2; 93-12 at ASPYR000597.) Aspyr

2   reasonably believed that approval was valid because it was the exact same approval

3   given for a previous release of KOTOR II and the Mod on a different gaming

4   platform than Nintendo. (Blair Decl. at ¶ 4.) As Plaintiffs admit, there is no

5   question that Aspyr believed it would release the Mod when it released the

6   YouTube trailer.[3]

7          On July 22, 2022, Lucasfilm conditioned the Mod's release on obtaining

8   individual agreements with all the contributors. (Dkt. 91-1; 93-11) Aspyr and the

9   Mod Leaders set out to do just that and at the time had no reason to believe they

10  would not be able to do so. Aspyr additionally worked on alternative plans in the

11

---

12  [3] *See* Scully Decl., Att. D at 73:16–74:1 ("Q Do you know whether, at the time Aspyr

13  made the trailer, they intended to release the restored content mod? A Yes, they did

     intend to release it. Q Did or did not? A They did intend to release the restored

14  content mod."); Scully Decl., Att. E at 43:8–13 (Q: "[D]o you think Aspyr intended

15  to deceive people about promising the DLC and not providing it?" A: "They may

     not have intended originally[.]"); Scully Decl., Att. F at 14:15–19 ("To my

16  understanding because they intended to do so. Whether or not they did at the time I

17  bought the game, I don't know. Because I bought it I think a few months after

     release, and at that point I'm not sure if that was still the plan."); Scully Decl., Att.

18  G at 68:21–69:2 ("Q So it's your understanding that Aspyr made the trailer, they

19  were intending to release the DLC at some point? A Yeah."); Scully Decl., Att. H at

     65:13–24 ("Do you know if Aspyr intended to release the DLC when they first

20  made the announcements about the DLC in the rerelease? A. I would assume if

21  you're putting it out on a Nintendo platform for -- you know, YouTube, I would

     assume that. Yeah. I would assume you would be, you know, expecting to actually

22  put that out. Q. So you don't think that Aspyr was lying when they said that they

23  were going to release the DLC with the rerelease of KOTOR II? … A. I don't think

     they were lying."); Scully Decl., Att. I at 15:13-17 (Q: "[D]o you think when Aspyr

24  made that statement that they would release the DLC, do you think they intended

25  to do it?" A "I would -- I would hope so[.]"); Scully Decl., Att. J at 46:2–6 ("Q. Do

26  you believe that when Aspyr made the YouTube video that you saw that they

     intended not to release the DLC? A. No. I think that when they first announced it,

27  they planned on it. Right? I mean, why would you announce it if you didn't plan on

28  giving it out?").

event that not all signatures could be obtained. Lucasfilm provided positive feedback on one such plan, pending only approval from legal counsel. Thus, between July 22, 2022, and about late March 2023--when they were told otherwise—Aspyr and the Mod Leaders intended and believed the Mod would be released shortly.

> **2.    The California, Colorado, Oregon, and South Carolina classes must be dismissed because Plaintiffs cannot show Aspyr knew the statements were false when they were made.**

Both California's False Advertising Law (FAL) and Consumer Legal Remedies Act (CLRA) require a showing that the defendant knew or reasonably should have known that any false statements were in fact false when made. The required showing of scienter for FAL claims is based in the statute's express reference to an "intent not to sell" property as advertised or "to induce the public to enter into any obligation." Cal. Bus. & Prof. Code § 17500. In addition, the FAL requires a showing that actionable statements must be "known [by the defendant], or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*; *see also Hughes v. Autozone Parts*, 2018 Cal. Super. LEXIS 112887, *33 (Cal. Super. Ct. L.A. Cnty. July 20, 2018). Thus, the FAL prohibits only "negligent as well as intentional dissemination of misleading advertising." *People v. Forest E. Olson Inc.*, 137 Cal. App. 3d 137, 140 (Cal. Ct. App. 1982). With regard to negligence, a duty of reasonable care can be satisfied by verifying and investigating representations when facts are present that would put a reasonable person on notice that the representations are possibly false. *Id.* at 139.[4]

For example, the claim in *Dickson v. Jack in the Box, Inc.* centered on a

---

[4] *See Balistreri v. McCormick & Co.*, 2023 WL 5988600, 2023 U.S. Dist. LEXIS 162583, at *38–39 (N.D. Cal. Sep. 13, 2023) (explaining the "reasonable person" standard) (*citing Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 682 (Cal. Ct. App. 2006), as modified on denial of reh'g (Jan. 31, 2006)).

1  "mistaken $2.99 price for the Jumbo Jack on the menu board." 2024 Cal. Super.

2  LEXIS 38573, at *4 (Cal. Super. Ct. Orange Cnty. Aug. 30, 2024). The court

3  denied the claim because there was no evidence that the defendant knew of the

4  error. *Id.* By contrast, in *Pom Wonderful Ltd. Liab. Co. v. Purely Juice, Inc.*, which

5  involved claims of "pure" pomegranate juice, the court found that the defendant

6  did not exercise reasonable care under the FAL. 362 F. App'x 577, 580 (9th Cir.

7  2009). The court observed that it was widely known in the juice industry that there

8  were serious issues of adulteration with pomegranate juice concentrate originating

9  from outside of the United States, and the defendants were paying well below the

10  market rate and had test results indicating that at least some of its products were

11  not pure. *Id.* On those facts, the court found that the defendant did not exercise

12  reasonable care to prevent the false or misleading nature of its advertising. *POM*

13  *Wonderful LLC v. Purely Juice, Inc.*, 362 F. App'x 577, 580 (9th Cir. 2009).

14      CLRA claims likewise require Plaintiffs to prove that Aspyr knew or had

15  reason to know of the facts that rendered the representation misleading at the

16  time it was made. *Stewart v. Electrolux Home Prods.*, 304 F. Supp. 3d 894, 906

17  (E.D. Cal. 2018)[5]; *see also Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d

18  1156, 1162–63 (N.D. Cal. 2011). And, to prove a fraudulent business act

19  under the UCL,[6] a plaintiff must show that the defendant knew, or by the

20  exercise of reasonable care should have known, of the facts that rendered the

21  [5] (citing *Neu v. Terminix Int'l, Inc.*, 2008 U.S. Dist. LEXIS 60505, 2008 WL
22  2951390, at *3-4 (dismissing CLRA and UCL claims because plaintiff did not
    sufficiently allege that defendant knew its statements were false or misleading at the
23  time they were made); and *Wilson v. Hewlett-Packard*, 668 F.3d 1136, 1145-46 (9th
24  Cir. 2012) (UCL and CLRA claims require actual knowledge)).

    [6] California's UCL requires: (1) one of "unlawful, unfair or fraudulent business act
25  or practice"; *and* (2) "unfair, deceptive, untrue or misleading advertising."
    California Business and Professions Code § 17200. (prohibiting "any unlawful,
26  unfair or fraudulent business act or practice and unfair, deceptive, untrue or
27  misleading advertising and any act prohibited by Chapter 1 (commencing with
28  Section 17500)."

representation misleading, at the time it made the representation. *Kowalsky*, 771 F. Supp. at 1161.

California Plaintiff Mickelonis purchased KOTOR II on November 22, 2022 and Plaintiff Munoz bought KOTOR II on March 19, 2023. (Scully Decl. at Att. K.) At those times, Aspyr neither knew nor had any reason to believe that it would not be able to release the Mod.

Oregon requires not only knowledge but intent. *See* Or. Rev. Stat. Ann. 646.608(1)(i) and (q) (providing that a person engages in an unlawful trade practice if in the course of business the person: (d) "Advertises … goods or services with intent not to provide the … goods or services as advertised, or with intent not to supply reasonably expectable public demand); or (q) "Promises to deliver … goods or services within a certain period of time with intent not to deliver the … goods or services as promised."). Plaintiffs must also prove a "willful" violation of the statute. *Rathgeber v. James Hemenway, Inc.*, 69 P.3d 710, 715 (Or. 2003). A willful violation only "occurs when the person committing the violation knew or should have known that the conduct of the person was a violation." *Id*. Plaintiff's only Oregon representative, Jacob Alva-Melville, purchased the game on June 3, 2022, before Lucasfilm expressed any concerns at all about the upcoming Mod release.

The South Carolina Unfair Trade Practices Act (SCUTPA) requires proof of at least constructive knowledge. *State ex rel. Medlock v. Nest Egg Soc. Today, Inc.*, 348 S.E.2d 381, 384 (S.C. Ct. App. 1986). South Carolina representative Jared Hilliard claims to have purchased the game on April 30, 2022--a surprising claim given that it wasn't offered for sale as a preorder until May 27, 2022 (*see* Rogers Decl. at ¶ 27)- -and long before any concerns were raised about its release.

The Colorado Consumer Protection Act (CCPA) mandates that liability for a deceptive trade practice is dependent upon knowledge or intent existing at the time of the advertising conduct. *Crowe v. Tull,* 126 P.3d 196, 204 (Colo. 2006); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.* 62 P.3d 142, 147 (Colo.

2003). In other words, the CCPA "does not create liability for those who intend to live up to the pronouncements of their advertisements but are negligent in action despite those intentions." *Crowe*, 126 P.3d at 204. Colorado has rejected a constructive knowledge standard in favor of actual knowledge. *State ex rel. Suthers v. Mandatory Poster Agency, Inc.*, 260 P.3d 9, 14 (Colo. App. 2009). Plaintiffs' two Colorado representatives purchased KOTOR II on June 7 and June 9, 2022, respectively, again before Lucasfilm expressed any concerns at all about the Mod's release—so, at that time, Aspyr could not possibly have been making an intentionally false statement because it had no reason to doubt the Mod's release.

**E.    Aspyr is entitled to summary judgment for any plaintiff or class member that did not see ads for the Mod prior to purchasing KOTOR II.**

A plaintiff that did not view or rely on marketing materials prior to his purchase does not have standing to assert claims. *Moorer v. StemGenex Med. Grp., Inc.*, 830 F. App'x 218, 220 (9th Cir. 2020); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012); *Archie v. Pop Warner Little Scholars, Inc.*, 2019 WL 4439493, 2019 U.S. Dist. LEXIS 160230, at *9–10 (C.D. Cal. Sep. 11, 2019); *Wheeler v. Estee Lauder Cos.*, 2013 WL 12121543, 2013 U.S. Dist. LEXIS 202157, at *9 (C.D. Cal. Feb. 12, 2013).

Without identifying the specific advertisements each Plaintiff purportedly saw—notwithstanding the Court's order to do so—each Plaintiff claims vaguely that "[b]efore purchasing KOTOR II Plaintiff saw Aspyr's KOTOR II video trailer and relied on Aspyr's promise that the DLC was 'coming soon' and advertisements about the release of the DLC." (Scully Decl. at Att. L). But the only YouTube history provided by any Plaintiff (Dkt. 66, p. 53) in response to Aspyr's discovery requests (*see* Dkt. 54, p. 70, RFP No. 5) shows that he saw the trailer on October 20, 2023—long after purchasing KOTOR II and three months after the lawsuit was filed.  Likewise, any class member that did not see the advertisements prior to purchasing KOTOR II is not entitled to present a claim.

Aspyr is similarly not responsible for content posted by third parties about the Mod's release. *Reed v. NBTY, Inc.*, 2014 WL 12284044, 2014 U.S. Dist. LEXIS 197398, at *15 (C.D. Cal. Nov. 18, 2014). This appears to form the basis of some Plaintiffs' claims. *See* Dkt. 66, p. 53, showing viewing of a product review by third party YouTube channel "Nintendo Life"); Scully Decl., Att. M at 14:1–3 ("It would be difficult for me to remember where I saw it first. I read several different videogaming websites like Polygon, Kinja, IGN …"). Any plaintiff—and any class member—that cannot provide evidence that they saw the advertisements before making the purchase must be dismissed.

**F.    The Georgia and Texas classes must be dismissed because Plaintiffs did not provide the required statutory notice.**

Ga. Code Ann. § 10-1-399(b) requires claimants to serve a "written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered" at least 30 days before a lawsuit is commenced. Similarly, Tex. Bus. & Com. Code § 17.505(a) provides that "a consumer shall give written notice to the person at least 60 days before filing the suit advising the person in reasonable detail of the consumer's specific complaint and the amount of economic damages, damages for mental anguish, and expenses, including attorneys' fees, if any." Plaintiffs did not provide this notice and the Georgia and Texas claims and classes should be dismissed.

**G.    The Illinois class should be dismissed because there is no Illinois claim.**

Plaintiffs assert an Illinois class but there is no Illinois claim. (SAC, ¶¶ 9, 44, and 54-148.) The Illinois class should be dismissed.

**H.    Aspyr is entitled to summary judgment for all claims based on state law that requires reliance or causation.**

A plaintiff asserting claims under Oregon's UPTA must prove causation between the statement allegedly in violation of the UPTA and the injury. *See Bohr v. Tillamook County Creamery Association*, 516 P.3d 284, 294–95 (Or. Ct. App. 2022)

1  (reversed and remanded on other grounds). For example, in *Bohr*, the court

2  dismissed a putative class action alleging that Tillamook falsely claimed that its

3  products were sourced from family farms. The *Bohr* court noted that "if the

4  purchaser did not care whether the product had a character or quality as

5  represented (or was not aware of the representation) and bought it for other

6  reasons, then the purchaser's expectations have not been frustrated." *Id.*

7  Additionally, Colorado, California, Florida, Georgia, and Nevada all require proof

8  of reliance or causation.[7]

9      If the Court allows Plaintiffs' classes to proceed— each of which include all

10  purchasers of KOTOR II—then Aspyr is entitled to summary judgment for all class

11  members in these states who did not rely on the advertisements.

## I.  David Kirkland is not participating in the case and should be dismissed.

13      Plaintiff David Kirkland has not responded to discovery requests. Counsel for

14  Plaintiffs represented that he was no longer interested in the case and that he would

15  be dismissed but failed to do so. Dkt. 6, 3–4. Kirkland should be dismissed because,

---

16  [7] **California:** *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 888 (2011) (requiring

17  actual reliance for UCL and FAL claims); *Caro v. Procter & Gamble Co.*, 18 Cal.

18  App. 4th 644, 667–69 (Cal. Ct. App. 1993) (requiring plaintiffs in a CLRA action

   show that the deception caused them harm by inducing purchase). **Arizona:** *Siemer*

19  *v. Assocs. First Capital Corp*, 2001 WL 35948712, 2001 U.S. Dist. LEXIS 12810, at

20  *13 (D. Ariz. Mar. 29, 2001) (noting that "a private claimant must show reliance")

   (citation omitted). **Colorado:** *Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 98

21  (Colo. 2011) ("Reliance often provides a key causal link between a consumer's

22  injury and a defendant's deceptive practice."). **Florida:** *Angelo v. Parker*, 275 So.3d

23  752, 755 (Fla. 1st DCA 2019). **Georgia:** *Tiismann v. Linda Martin Homes Corp.*, 281

   Ga. 137, 138 (Ga. 2006) ("a claimant who alleges the FBPA was violated as the

24  result of a misrepresentation must demonstrate that he was injured as the result of

25  the reliance upon the alleged misrepresentation."). **Nevada:** *Picus v. Wal-Mart*

   *Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) ("Because Defendants here

26  allegedly made an affirmative misrepresentation and Plaintiff could prove she

27  sustained damages as a result of Defendants' alleged misrepresentation only by

   demonstrating she relied upon a 'Made in the USA' label, the Court concludes

28  causation includes reliance in this case.").

absent his testimony, Plaintiffs do not have any evidence to proceed with his claims.

## CONCLUSION

Discovery has closed and Plaintiffs have insufficient evidence to proceed to trial. Plaintiffs cannot prove harm, standing, knowledge, or damages. Aspyr should be granted summary judgment as to all claims.

Dated: May 1, 2025

Respectfully submitted,

Newman LLP

s/ Keith Scully
_____
Keith Scully, *pro hac vice*
*keith@newmanlaw.com*
Nathaniel Durrance (SBN: 229210)
*nate@newmanlaw.com*
*Gregory M. Scialabba, pro hac vice*
*gs@newmanlaw.com*
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone: (310) 359-8200
Facsimile: (310) 359-8190

Counsel for Defendant
Aspyr Media, Inc.

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

**CERTIFICATE OF COMPLIANCE**

2     The undersigned, counsel of record for Defendant Aspyr Media, Inc., certifies

3  that this brief contains 6,991 words, which complies with the word limit of L.R. 11-

4  6.1.

5  Dated: May 1, 2025                         Respectfully submitted,

6                                             Newman LLP

7

8

9                                             s/ Keith Scully
                                              _____
10                                            Keith Scully, *pro hac vice*

11                                            Counsel for Defendant Aspyr Media,
                                              Inc.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury under the laws of the United States of America and the laws of the State of California that on May 1, 2025, I caused true and correct copies of the foregoing documents to be served by the method(s) listed below on the following interested parties:

**Via CM/ECF**

Ray Kim
Ray Kim Law, APC
112 E. Amerige Avenue, Suite 240
Fullerton, CA 9283
*ray@raykimlaw.com*

*Attorneys for Plaintiff*

I hereby certify under the penalty of perjury that the foregoing is true and correct.

Executed on May 1, 2025.

*Leah B. Lavigne*
_____
Leah Lavigne

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT